IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 31, 2021

**TRACY ROBERSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 293781   Thomas C. Greenholtz, Judge**

_____

**No. E2020-00643-CCA-R3-PC**
_____

Tracy Roberson, Petitioner, was convicted of one count of aggravated burglary, one count of especially aggravated kidnapping, one count of aggravated robbery, two counts of aggravated rape, and three counts of theft.  The trial court sentenced Petitioner to an effective sentence of sixty years in the Tennessee Department of Correction.  On direct appeal, this court modified one of the theft counts and merged the three theft convictions, affirming all other judgments.  Petitioner filed a pro se post-conviction petition and three amended petitions through counsel.  Following a hearing, the post-conviction court denied relief.  On appeal, Petitioner argues that he was denied the effective assistance of counsel and due process.  After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App.  P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Douglas A. Trant and Julia Anna Trant, Knoxville, Tennessee, for the appellant, Tracy Roberson.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural History

*Pretrial Motion to Suppress*

On direct appeal, this court summarized the proceedings on Petitioner's pretrial Motion to Suppress as follows:

Richard Roberson, [Petitioner]'s grandfather, testified that in August 2008, [Petitioner] lived with him in Hixson, Tennessee. Roberson described his house as having a five-foot high picket fence along the front, which was lined with Bradford pear trees. He said a driveway ran down the right side of the house to the back where the garage was located. An RV was in the backyard, and [Petitioner]'s vehicle was in the garage. He described tall hedges located along the sides of the house, saying that the shrubbery was overgrown because his health had prevented him from maintaining the yard. Roberson said that a person would be unable to see the garage or RV from the front road.

Roberson testified that, at around 1:30 p.m. on August 7, 2008, he awoke to find police officers "milling around" outside his house. He stepped out on his porch "[t]o find out what was going on" and found [Petitioner] speaking to the police. Shortly thereafter, police placed [Petitioner] in a police vehicle. Roberson told police that he needed to pick up [Petitioner]'s daughter from school. A police officer escorted Roberson into his house while Roberson changed and then walked Roberson out. Roberson said the police officer did not go anywhere in the house other than to escort Roberson in and out and that the police officer did not take anything from his home. Roberson left the house to pick up [Petitioner]'s daughter from school and did not return until around midnight. Roberson said he waited "another hour or two" before police allowed him to re-enter his home. Roberson said that police officers showed him a search warrant at "one or two in the morning."

On cross-examination Roberson testified that nothing obstructed his driveway from the street. He explained that the five-foot picket fence ran on either side of the driveway but did not close off his driveway from the public street. Roberson said that he did not see police officers go inside [Petitioner]'s vehicle. He recalled that police officers asked permission,

which he granted, to search Roberson's truck before he went to pick up [Petitioner]'s daughter from school.

[Petitioner] testified that he saw a police vehicle pull into the driveway at 1:56 p.m. on August 7, 2008. [Petitioner] said that one police officer "drove to the back corner of the house and was standing at the back corner of the house" when the [Petitioner] came outside. [Petitioner] said that police never presented him with a search warrant or arrest warrant. [Petitioner] said that he was placed in the front passenger seat of a police vehicle and told they were "detaining [him] for the city." As [Petitioner] sat in the vehicle, he observed two officers "wandering around the back of the house."

On cross-examination, [Petitioner] testified that his car was parked on the righthand side of the two car garage and was visible from the back of the house. [Petitioner] agreed that police officers saw his black BMW when they initially pulled into the driveway. [Petitioner] said that he was unaware at the time of the search that he was a suspect in these crimes.

Melissa Croft testified that she and [Petitioner] had a child together. Croft recalled that [Petitioner] drove her to the hospital on August 6 in his grandfather's truck. Croft inquired about [Petitioner's] BMW, and [Petitioner] told her that his cousin had borrowed the car. They returned to [Petitioner]'s home at 10:00 p.m. or 11:00 p.m. and, when [Petitioner] parked the truck next to the house, Croft did not see the BMW inside the garage. Croft said that she did not see the BMW the following morning, August 7, when she left the house at 7:00 a.m.

Following the proof, the trial court denied the motion after making the following findings:

> I find that there was probable cause for [the police] to be there looking for [Petitioner] and detaining him. I find that they did nothing improper driving down the driveway, seeing the BMW, and not conducting a search at the time, securing the premises and going for a search warrant. I find that there was nothing improper about going to Judge Steelman instead of a magistrate and obtaining a search warrant. I find that there's probable cause in the search warrant for . . . going to his home and searching his home and car based on all the information that they had and that's contained in the search warrant.

- 3 -

*State v. Tracey A. Roberson*, No. E2011-01907-CCA-R3-CD, 2013 WL 5775832, at *2-3 (Tenn. Crim. App. Oct. 24, 2013), *perm. app. denied* (Tenn. April 9, 2014).

*Trial and Direct Appeal*

On direct appeal, this court summarized the facts presented at trial as follows:

Lucas Timmons, a Chattanooga Police Department officer, testified that, at a little after 2:00 a.m. on August 7, 2008, he responded to a call at the 1500 block of Mississippi Avenue. Police had received a report of a dark-colored vehicle parked in front of an empty house where two males were "checking out" the house. After investigating the complaint, and as Officer Timmons was leaving, he noticed a black BMW parked approximately a half of a block down the street. Based upon the report of a dark-colored vehicle, Officer Timmons ran the license plate to identify the owner. The black BMW was registered to [Petitioner].

Officer Timmons testified that, later that same morning, he was dispatched to investigate the report of a potential rape/burglary at a residence located on Centennial Drive, which was in the same area where he had earlier observed the black BMW. He arrived at the residence shortly after 5:00 a.m. A neighbor met him outside and [led] him into the house. Inside a bedroom in the house, Officer Timmons found the victim on the side of the bed with her hands duct-taped behind her back and her ankles duct-taped together. Officer Timmons said that he cut the tape from her wrists and ankles, and he described the victim as "extremely upset and frightened." The victim told the officer she had been slapped in the face, and the officer testified that he observed minor swelling in the area.

Officer Timmons testified that he walked through the entire house and found evidence of forcible entry through the basement door at the rear of the house. Officer Timmons also observed a wall in the master bedroom closet that was damaged and a hammer lying on the floor near the area. Officer Timmons described the damage as a hole in the wall that appeared to be where a wall safe would be kept. As Officer Timmons was exiting the home, the victim advised him that her vehicle was missing.

Officer Timmons said that he proceeded nearby to the 1500 block of Mississippi Avenue where another officer had found the victim's vehicle parked. Officer Timmons said that he found it "curious" that the victim's

- 4 -

vehicle was parked directly behind where [Petitioner]'s black BMW had been parked a few hours earlier. [Petitioner]'s BMW was no longer there.

The victim testified that she was nineteen-years old and a college student at the time of these crimes. She was staying in the home on Centennial for a few days while the homeowners, Allen and Alison Lebovitz, were out of town. . . . At around 10:45 p.m., she took the Lebovitz[es'] dog outside before going to bed. At around 2:00 a.m., the dog began barking, so the victim took the dog outside again, locking the doors after she returned back inside the house.

The victim testified that the dog awoke her again barking. She assumed the dog needed to go outside and picked up her cellular phone to check the time and saw it was 4:00 a.m. Almost immediately she heard footsteps and realized a man was in her room, which she described as dimly lit. The man walked around to the victim's side of the bed. She said that she saw a small light that appeared to be emanating from an item held in the man's hand, but she could not determine the source of the light. She compared the light to a small flash light found on some types of cellular phones. The man yelled at the victim to put her cellular phone down and began hitting the victim. The victim could not see what was in the man's hand but felt a hard object as he repeatedly hit her. The victim dropped her cellular phone, and the man picked it up and placed her phone on the bed side table out of the victim's reach. The man then bound the victim's hands behind her and her feet together with duct tape. The man asked the victim where the safe was located in the house, and the victim told him she did not know. The victim said that she could hear the man going through the rooms of the house until he found the safe. She then heard banging and hammering for approximately a half hour coming from the upstairs bedroom.

The victim testified that the man came in and out of her room multiple times, and she observed that he was wearing a brimmed hat and a bandana around his head that "came down to a point at his chin." She said the man wore heavier shoes "like maybe work boots" and also pants and either a three-quarters length shirt or a long-sleeved shirt with the sleeves pushed up. She described something like a fanny pack or tool belt around the man's waist, from which she heard metal "clanking together." The man also wore short gloves that she described as being neither leather nor cloth. The victim identified a hat collected from [Petitioner]'s vehicle as looking like the hat the man wore the night of the burglary. The victim then felt a pair of gloves

also collected from [Petitioner]'s vehicle and agreed that the gloves felt the same as those worn by the intruder when he touched her.

The victim testified that the man returned to the room and said to the victim, "you said you would do whatever I asked and now it's time." The victim said that she had never made such a statement to the man. The man turned the victim over, pulled her pajama pants down and raped her. The victim recalled that the man called her "baby." The victim began screaming, and the man told her that he would "bust [her] head in if [she] didn't stop." In her statement to police, the victim said the man said to her, "I have guns, don't make me use them."

After the man penetrated the victim both anally and vaginally, he pulled her pajama pants back up and walked over to her backpack. He found her wallet, took out her driver's license, and addressed her by name saying that he was going to take her driver's license so that if she made a report to police, he would know her name and where she lived in order to find her. The victim said her school identification was also in her wallet. Upon seeing the school identification[,] he told the victim to stay in school so that she could get a good job. He then told the victim that it was 5:00 a.m. and that the housekeeper would arrive at the house at 7:00 a.m. He said that he would return and remove the duct tape before the housekeeper arrived, and he left the room. Less than a minute later, he came back into the room, went through the victim's backpack and took her car keys. The man left through the front door of the house.

The victim testified that she waited for a period of time and when she heard no noises she slid off the bed and retrieved her cellular phone from the bedside table to call 911. The parties then stipulated that a recording submitted by the State was the 911 call placed by the victim.

The victim testified that two weeks before her stay at the Lebovitz[es'] home, there had been a storm that caused damage to the roof of the house. The victim said that a construction crew worked on the roof while she stayed there. The victim said that she did not know Wayne Ledford but that he was working with the construction crew at the Lebovitz[es'] house. She said that the man who raped her was not Ledford. She explained that the man spoke "a lot," and she had spoken with Ledford the day before and it was not his voice.

The victim testified that she had a 2004 Ford Escort that was taken that night. The victim testified that she had "no idea" of the value of the vehicle. The victim said that the man also took $60.00 cash from her purse.

On cross-examination, the victim explained that she babysat for the Lebovitz[es'] next-door neighbors on both Tuesday and Wednesday. On Tuesday, when she returned to the Lebovitz[es'] home, the construction crew was at the house for approximately an hour and she spoke with Ledford. She provided this information to police, even though it occurred the day before the burglary, to help develop potential suspects. After babysitting on Wednesday, August 6, 2008, and going to her apartment, she returned to the Lebovitz[es'] home where she was alone.

April Tumlin, a sexual assault examiner, testified that she examined the victim on August 7, 2008. Tumlin said that the victim explained what had occurred during the assault, and then Tumlin conducted a physical assessment of the victim. She prophylactically treated the victim for sexually transmitted diseases and conducted an anal and vaginal exam, which included swabs for DNA testing. Tumlin said that the victim had a small abrasion to her left eyelid and a small abrasion to her left ear. During the vaginal exam, Tumlin found a small abrasion at the base of the victim's vagina. Tumlin described the victim as fidgeting, "reluctant to speak," and crying during the exam. Tumlin said that the victim indicated that she had been penetrated vaginally and then anally for a short time before the man penetrated her vaginally again.

Alan Lebovitz testified that he lived at 1104 Centennial Drive. Lebovitz recalled that on August 6 and 7, 2008, he was in New York City and returned home on August 7, 2008. Lebovitz said that, during his departure, a construction crew worked on roof and water damage sustained to the house during a bad storm, and Wayne Ledford supervised the project. Lebovitz said that Ledford had worked on several projects on the home over the past two to two and a half years. Lebovitz said that a guest room was located on the main floor of his home, and the master bedroom was upstairs. Lebovitz testified that he had a safe in his house that was located inside a closet "off the master bedroom/bathroom."

Lebovitz testified that he learned of the burglary to his home at approximately 6:30 a.m. on August 7, 2008, and he arrived home at approximately 3:00 p.m. that afternoon. When he arrived, he found that the

safe had been forcibly removed from the closet. He said that he kept passports, paperwork, small jewelry items, an antique watch, and some cash in the safe. He estimated a total value of the items inside the safe of $57,612.00. This value was based on appraisals through the insurance agency and the purchase price of some of the items. He estimated the value of the safe at between $1,000.00 and $2,000.00. Lebovitz identified a black and gray gym bag that he had been missing for the past year. Lebovitz also identified the safe that was inside the gym bag as the one that had been removed from the closet in his home. On cross-examination, Lebovitz said that the hammer found in the closet did not belong to him.

Heather Stone, a Chattanooga Police Department officer, testified that she processed the crime scene, [Petitioner]'s residence, and [Petitioner]'s BMW for fingerprints and evidence. Officer Stone identified evidence collected from the crime scene, which included a Jansport book bag, duct tape, bedding from the bed the victim slept in, and a fiberglass claw hammer. Later that day, Officer Stone reported to [Petitioner]'s residence for further collection of evidence. Officer Stone said that she was instructed to look for several items: a "boonie-type" hat, a dark-colored bandana, a long-sleeved shirt, jeans, a tool belt, leather or suede work gloves, a metal safe, passports, jewelry, and a Verizon wireless cellular phone. Officers processed [Petitioner]'s BMW first and, upon opening the trunk of the car, Officer Stone saw a blue boonie hat and a rolled up long-sleeved red shirt. Upon further inspection, Officer Stone observed a gun, a gun belt, and a black duffel bag with a safe inside. The BMW was transported back to the police department where the BMW was photographed and the contents inventoried.

Officer Stone testified that, in the driver's side door pocket, police found flashlights, one of which was a gun tac light. Officer Stone described a tac light as a small light that attaches to the under side of a pistol barrel. Between the console and the driver's seat, police found a Glock pistol wrapped in a Nautica shirt. The Glock was loaded with a magazine and another magazine was found in the console of the car. In the glove compartment box, police found two packaged Lifestyle condoms, two packaged Durex condoms, two packages of sexual stimulants, Stamina Rx tablets, one of which was empty, and a "mini ephedrine packet of pills" with several pills missing. On the floorboard behind the driver's seat, police found a "flag of our fathers" green bag that contained a pair of black tactical police gloves, a stack of 50 one dollar bills, a stack of 24 one dollar bills, and a stack of 53 one dollar bills. From the trunk, police collected a Cabelas'

camouflage fanny pack. Inside the fanny pack were three screw drivers, a hammer, a chisel, a small crow bar, "a glass suction cut item," a half face mask, and a roll of black duct tape.

Officer Stone testified that the dial on the safe she found in the trunk of [Petitioner]'s BMW was missing, and the door was broken. Inside the safe were passports and paperwork. Inside the trunk, police found black hand ties, tools, an extension cord, police body armo[r], a ski mask that covered the entire head except for the eye area, a fanny pack, black duct tape, a blue bucket with cleaning supplies, a red long-sleeved shirt, and a black bag that contained two black crow bars, a wrench, a chisel, and a Dewalt grinder. Police also found a police duty belt containing a Glock 23, 40 caliber pistol with a full 13–round magazine, pepper spray, handcuffs, a flashlight, a baton, and two gun magazines.

Officer Stone testified that, after [Petitioner] was transported to the police department, she obtained a buccal swab and fingerprints from [Petitioner] for analysis.

Gregory Mardis, a Chattanooga Police Department officer, testified that he was assigned to the crime scene unit and helped processed the victim's car for evidence. On the front floorboard of the vehicle, the officer found a bag, a checkbook, and the victim's Tennessee driver's license. Later that day, Officer Mardis searched [Petitioner]'s house for evidence. Officer Mardis said that he collected two pairs of underwear and a pair of gloves. Officer Mardis testified that he swabbed [Petitioner]'s penis for DNA analysis.

Steve Wertel testified that he worked in the Chattanooga Police Department as a crime scene investigator in August 2008. In furtherance of the investigation in this case, Officer Wertel collected a buccal swab from Wayne Ledford.

. . . .

Alexis Mercado, a Chattanooga Police Department officer, testified that he reported to the crime scene at 7:00 a.m. on the morning of August 7, 2008. After learning [Petitioner]'s name from the tag information on his BMW, police officers began asking potential witnesses if they recognized the name. Police officers asked Wayne Ledford, a supervisor of the

construction being done on the Lebovitz[es'] home, and he said that he recognized the name as his cousin's. Later that same day, Officer Mercado participated in the execution of a search warrant at [Petitioner]'s residence, where [Petitioner] was placed under arrest. At the police station, a cellular phone was taken from [Petitioner]'s person. Through the telephone number associated with the phone, the police obtained cellular phone call records showing the call activity for the phone.

Officer Mercado testified that he obtained a value for the victim's vehicle from Kelly Blue Book . . . in "fair condition" [at] $2,805.00. . . .

On cross-examination Officer Mercado testified that, when officers arrived at the residence where [Petitioner] was staying, [Petitioner]'s black BMW was parked in the back portion of the driveway. He said that no one touched the BMW until he obtained the search warrant.

Mark Hamilton, a Chattanooga Police Department officer, testified that he is trained to conduct technological investigations, which includes cellular phone records analysis. He explained that cellular phones communicate through towers that are located throughout a city. When a transmission occurs, the cellular phone company records the activity. Officer Hamilton said that the cellular phone on [Petitioner]'s person at the time of his arrest was a Cricket cellular phone. He identified the phone records for the number associated with the phone taken from [Petitioner] and a listing of the location of all Cricket cellular phone towers in the area.

[Officer] Hamilton identified a map he created showing the location of the cellular phone towers used to transmit [Petitioner]'s phone calls throughout the night of August 6 and the morning of August 7, 2008. At 11:13 p.m., cellular phone activity for [Petitioner]'s phone was transmitted using a tower near [Petitioner]'s residence. There were three cellular phone towers in the area near the Lebovitz[es'] home. Beginning at 12:20 a.m., [Petitioner]'s cellular phone activity was transmitted through one of these three cellular phone towers near the area of the crimes. [Petitioner]'s cellular phone activity continued to use one of the three towers located near the Lebovitz[es'] home until 3:58 a.m., when [Petitioner]'s cellular phone was turned off until 4:23 a.m. Officer Hamilton said that, using a "special engineer's phone," he placed calls in the area of the crimes and one of the three towers predominantly transmitted the signal and "occasionally" the

other two towers transmitted the call. Officer Hamilton explained that cellular tower signals overlap in some areas.

Wayne Ledford, [Petitioner]'s cousin, testified that, through his work in the home repair business, he had been involved in multiple home improvement projects on the Lebovitz[es'] house over the course of two to two and a half years. During this time, Ledford said that he converted the attic into living space, remodeled the basement area into a children's playroom, expanded the house to add a storage area, waterproofed the front of the house, and remodeled the master bath[]room. Ledford recalled that, in August 2008, he was working on some repairs to the Lebovitz[es'] home.

Ledford described his relationship with [Petitioner] as one where the two men would occasionally go to clubs, talked on the phone, and were at family events together. He said that he and [Petitioner] "never really h[u]ng out." Ledford said that he called and spoke with [Petitioner] on the day before these crimes after leaving the Lebovitz[es'] house for the day. Ledford said that he called [Petitioner] to see if he wanted to "get together" on Friday or Saturday of that week. Initially, the two men engaged in small talk and then [Petitioner] asked if Ledford was working. Ledford told [Petitioner] that he was "baby-sitting" subcontractors, masons, and a sheet-rock finisher. [Petitioner] asked if the homeowners were at home while the sheet[]rock was being torn out of the ceiling in the kitchen. Ledford told [Petitioner] that the homeowners were out of town while "that demo work" was being done. [Petitioner] responded saying, "they just let you go in and out of the house like that." Ledford said that he told [Petitioner] that the homeowners trusted him and that a housekeeper was present most of the time as well as there was a house sitter who was taking care of the family dog.

Ledford testified that [Petitioner] had been to the Lebovitz[es'] house before when [Petitioner] had picked up Ledford to go to lunch. Ledford said that he had also shown [Petitioner] before and after pictures of the remodeling on the house. Ledford said that on Wednesday, August 6, 2007, he left the Lebovitz[es'] house after lunch, around 1:30 p.m. or 2:00 p.m. and went home where he remained until the following morning. Ledford denied borrowing [Petitioner]'s BMW the night of August 6 and stated that he had never driven the BMW. Ledford further denied possessing [Petitioner]'s cellular phone or underwear during the night of August 6.

- 11 -

Ledford testified that, at 7:00 a.m. on August 7, 2008, his boss called to tell Ledford that the Lebovitz[es'] house had been burglarized and the house sitter raped. Ledford arrived at the Lebovitz[es'] house at 8:00 a.m., where he found a lot of police officers. Ledford explained that electricians were scheduled to work on the house that day, so he went to the Lebovitz[es'] house to let the electricians know they were not needed at that time. Ledford said that police detectives requested a DNA sample, and Ledford agreed. At some point, a police officer asked if anyone knew someone by [Petitioner]'s name, and Ledford told police that was his cousin's name.

On cross-examination, Ledford agreed that, at the time of these crimes, he was "several thousand dollars" behind in his child support payments. Ledford agreed that there were times that the electricity at his home was turned off, explaining that he paid his child support rather than his electric bill on several occasions. He further agreed that, in 2008, he was also two months behind on his mortgage payments. Ledford said that, through his work in the Lebovitz[es'] house, he was familiar with the layout. Ledford said that he gave his cellular phone to police who looked at the call log and then returned it to him. Ledford denied owning a Glock pistol.

The State then submitted, by stipulation of the parties, two latent fingerprint reports. Shelly Betts, a Tennessee Bureau of Investigation ("TBI") agent, testified on behalf of a colleague who examined the safe and a claw hammer found in the closet where the safe was kept. Betts said that the TBI was able to conclude that the claw hammer produced two of the tool marks present on the door of the damaged safe that was recovered from [Petitioner]'s BMW. Another tool mark on the safe was produced by a rotating blade, but the mark was insufficient for purposes of comparison with tools collected from [Petitioner]'s BMW.

Linda Littlejohn, a TBI agent, testified as an expert in the area of microanalysis. [Agent] Littlejohn identified the report she generated from her examination of duct tape submitted in this case. [Agent] Littlejohn examined a piece of duct tape from the victim and found that it did not match up with the fracture lines found on the end of the roll of duct tape found in [Petitioner]'s car. Her physical comparison of the roll of duct tape and the pieces of duct tape were that the pieces and roll were consistent with respect to size, appearance, and construction.

Michael Turbeville, a TBI agent, testified as an expert in serology DNA. [Agent] Turbeville said that he examined the victim's blood sample and buccal swabs from Ledford, the victim's boyfriend, and [Petitioner]. Other items submitted for analysis were the victim's panties, [Petitioner]'s underwear, a pair of gloves, bedding from the guest room of the Lebovitz[es'] house where the victim stayed, and the wall safe. The victim's shorts and vaginal and anal swabs failed to reveal the presence of semen. Upon examination of the victim's panties, [Agent] Turbeville found a limited presence of spermatozoa on the crotch area. The sample was a mixture of DNA from two individuals. The two individuals were identified as the victim and her boyfriend.

[Agent] Turbeville testified that a pair of black gloves recovered from [Petitioner]'s car also contained a mixture of DNA. The major contributor of the DNA was [Petitioner], and the victim could not be excluded as a minor contributor. [Agent] Turbeville said that he received two pairs of [Petitioner]'s boxer briefs, one pair black and the other white. He swabbed the inside surface of the fly area of [Petitioner]'s black boxer briefs and found the presence of a DNA mixture. The partial profile indicated that the major contributor of the mixture was the victim, and the minor contributor was consistent with [Petitioner]'s DNA profile. [Agent] Turbeville also tested the second white pair of boxer briefs and found the presence of a DNA mixture in the fly area. The sample contained a complete DNA profile for the major contributor, who was the victim. The minor contributor was consistent with [Petitioner]'s DNA profile. The sample from the white boxer briefs was also compared against Ledford's sample, and he was excluded as a contributor. [Agent] Turbeville also noted that, although there is no test to confirm, he observed fecal matter on the fly area of the white boxer shorts.

Melissa Croft testified on [Petitioner]'s behalf. She said that she and [Petitioner] had a child together. Croft recalled that in the afternoon of August 7, 2008, she called [Petitioner] and asked him to meet her at "Save-A-Lot" to take her to the hospital. [Petitioner] drove Croft, in his grandfather's truck, to Memorial Northpark first, but the hospital was "kind of packed," so they proceeded to Erlanger North. After treatment and release from the hospital, [Petitioner] drove Croft to Walgreens to fill a prescription. [Petitioner] and Croft then drove to an area on Old Hixson Pike where there was an abandoned house and "had sex" without the use of a condom. Croft estimated they were at that location approximately an hour before driving to a Steak and Shake restaurant to eat, at around 4:00 p.m., located on Hixson

- 13 -

Pike. Next, they picked up [Petitioner]'s daughter from school and took her to a McDonald's to let the child "play and eat." After leaving McDonald's, at approximately 8:00 p.m., they drove to [Petitioner]'s house.

Croft testified that, after arriving at [Petitioner]'s home, [Petitioner] bathed his daughter and put her to bed. Around 10:00 p.m., [Petitioner] came into the bedroom where Croft was in bed, and the two again engaged in unprotected sex. Croft said that they fell asleep at approximately 4:00 a.m.

Croft testified that [Petitioner] drove her, in his grandfather's truck, back to her car at around 7:00 a.m. on August 7, 2008. Croft said she did not see [Petitioner]'s BMW while at his house, explaining that she entered and exited through the front door and could not see "the back."

On cross-examination, Croft agreed that, prior to the night of August 6, she and [Petitioner] were "estranged." [Petitioner] had custody of their child and would not allow Croft to see the child. Croft admitted to an addiction to "meth" but testified that she had "been clean for two months." Croft said that she had not spoken to [Petitioner] in eight months when he called her from jail "to talk." She said that she tried to visit him in jail "just recently" but was not permitted to see him because she did not have identification. After the State played a portion of a May 2009 recorded jail telephone conversation between [Petitioner] and Croft, Croft agreed that, during the conversation, she asked [Petitioner] when she could see their daughter. Croft did not agree that [Petitioner] had "control" over her visitation with their daughter, but said that he had "custody of her." Croft explained that [Petitioner]'s response to Croft's request during their telephone conversation to see their child, "I don't know, baby, I need to talk to you," meant that he wanted to make sure she was "clean." Croft denied ever discussing the alibi with [Petitioner].

After hearing this evidence, the jury convicted [Petitioner] of one count of aggravated burglary, one count of especially aggravated kidnapping, one count of aggravated robbery, two counts of aggravated rape, one count of theft of property valued under $500.00, one count of theft of property valued over $1,000.00, and one count of theft of property valued over $60,000.00.

*Id.* at *3-11. On direct appeal, this court modified Petitioner's conviction for theft of property over $60,000 to theft of property over $10,000, merged the theft convictions, and affirmed Petitioner's remaining convictions. *Id*. at *1.

## Post-Conviction Petitions

Petitioner filed a timely pro se post-conviction petition, arguing that he was denied the effective assistance of trial counsel and appellate counsel. Following appointment of first post-conviction counsel, Petitioner filed an amended petition through counsel. First post-conviction counsel withdrew, and the court appointed second post-conviction counsel. Petitioner filed a second amended petition through counsel, incorporating the claims in the first two petitions and further arguing that evidence was seized in violation of the Fourth Amendment, various other evidentiary issues, improper prosecutorial argument and judge's comments, denial of due process due to the trial court's failure to order a change of venue, and denial of due process due to the trial court's failure to charge the jury pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012). Third post-conviction counsel was appointed, and a third amended petition was filed.[1]

## Post-Conviction Hearing

Post-conviction counsel told the post-conviction court that Petitioner would proceed solely on the enumerated claims in the second and third amended petitions. Upon questioning by the post-conviction court, Petitioner agreed to voluntarily waive all other claims.

Petitioner, a former Hamilton County Sheriff's Department deputy, testified that, when police searched his phone and vehicle, he was not present. He said that, when he arrived home, police detained him for over an hour in a police car. Petitioner stated, "[T]wo detectives had walked around behind the house and were gone for about [twenty] minutes or so." Petitioner told one officer that they did not have permission to be behind the house, nor did they have a search warrant, so the officer called the two other officers to "come back up. But they had already been back there for [twenty] or [thirty] minutes[.]" Petitioner stated that his "out-buildings" were searched behind his home. He explained, "[T]here was no way from the street or from the side -- either side of the house or the rear to know if those buildings were there to know that a fifth-wheel camper was there." He said that the trunk and the interior of his BMW, which was parked "halfway" in the garage with the trunk inside the garage, "had been gone though and searched as well."

---

[1] The third amended petition does not appear in the record on appeal.

- 15 -

Petitioner stated that he did not know if the officers found anything in his BMW or the fifth-wheel camper but said that there were "subsequent searches" of the BMW. He said that his phone was not searched. Petitioner said that he never saw a search warrant or arrest warrant and that officers did not have permission to be on the property. He said that he never received a "chain of evidence" for things removed from his property. Petitioner agreed that trial counsel filed a Motion to Suppress the evidence found during the searches and that appellate counsel raised the issue on direct appeal.

Petitioner stated that he received a report that officers "took swabs" from various places in his car but said that "it was never tested[.]" Petitioner explained that he tried to independently raise money for DNA testing since an indigent, non-capital post-conviction petitioner is not entitled to independent testing. He also said that the swabs of his penis were tested by the TBI lab and that the results showed DNA from "an unknown female excluding the victim." Petitioner wanted the swabs to be tested against Ms. Croft, who was his alibi witness, to bolster her credibility since she was discredited at trial as a methamphetamine addict. Petitioner stated that he wanted the bedding and the victim's clothing tested for lubricant since the State's theory was that the attacker used a condom to prevent leaving his DNA. Petitioner said that there was no evidence presented at trial that a condom was used during the rape. He said that trial counsel was deficient for failing to file a motion for further DNA and lubricant testing.

Petitioner asserted that no "voice lineup" was conducted and that trial counsel was deficient for failing to file a motion for one. He said that, after the victim testified at trial, she sat in the courtroom while recordings of jailhouse calls were played. He asserted that she never came forward to say that his was the voice she heard on the night of the rape.

Petitioner said that the gloves found at the scene and allegedly worn by the attacker were tested for DNA and revealed DNA for both Petitioner and an unknown female. He said that there was "most definitely" tension between trial counsel and the trial court.

Petitioner testified that the TBI report showed that the "fracture lines" on the victim's duct tape and the roll found in Petitioner's BMW did not match. Petitioner stated that trial counsel never filed a motion in limine before trial seeking to exclude the duct tape from his vehicle.

Petitioner said that the TBI tested his cell phone for DNA and that the report came back saying "unknown male number three[.]" Petitioner asserted that trial counsel failed to request further DNA testing of his weapon or cell phone or any other object that could have been used to hit the victim. He said that the State "picked and [chose] what they

- 16 -

wanted to send to the TBI lab." Petitioner stated that, among the DNA testing that was performed, there were three unknown males and two unknown females.

Petitioner testified that trial counsel talked to him about cross-contamination but then offered no expert proof at trial and did not file a motion in limine to exclude the evidence that was allegedly contaminated. He said that one detective testified that he put two pair of underwear into the same evidence bag and then later put Petitioner's penis swab in the same bag with the two pair of underwear from Petitioner's house. Petitioner said that the same officer placed the victim's driver's license and checkbook in the same bag together.

Petitioner stated that the pry marks on the back door of the home did not match the tool markings on the safe. He explained that the TBI report of the tools found in his vehicle showed that none of the tools matched the back door or the safe. He said that trial counsel did not object to any of the evidence the State offered and did not offer an expert in tool mark identification.

Petitioner testified that the State's expert witness only had one eight-hour course on cell towers and that trial counsel did not object to him as an expert witness. Trial counsel also did not offer his own cell tower expert witness. Petitioner said that, when he received his file, he noted that the records from Cricket Wireless said that the information was "raw data" and was "not to be used for location or anything to do with like that, especially because it [wa]s not authenticated from Cricket Wireless."

Petitioner said that he wanted the hair samples and fingerprints found in his car to be tested against Ms. Croft and Mr. Ledford. He said that, because Mr. Ledford used his vehicle on the night of the rape, trial counsel should have requested testing to prove the defense theory of mistaken identity.

Petitioner testified that trial counsel did not pursue plea negotiations. He said that trial counsel presented an offer from the State where Petitioner would receive fifteen or twenty years if he "were to tell them where the jewelry could be recovered[.]" Petitioner asked trial counsel to get the plea offer in writing and that he would "make every effort" and "beg and plead with Mr. Ledford to try to recover the jewelry." He said that he would have taken such a plea agreement.

On cross-examination, Petitioner agreed that trial counsel filed a Motion to Suppress the evidence taken pursuant to the search warrant but said that the trial court did not allow trial counsel to finish arguing. He said that the trial court had already concluded that "there wasn't anything wrong with the search warrant itself[.]" Petitioner agreed that the

propriety of the search was litigated on direct appeal and that his appeal was denied on that point.

Petitioner stated that Officer Mercado testified at the preliminary hearing that the duct tape found in the BMW matched the duct tape on the victim. He explained that trial counsel confronted Officer Mercado on cross-examination at trial, and Officer Mercado "corrected hi[m]self."

Petitioner testified that trial counsel cross-examined Agent Turbeville "a lot about DNA touch evidence and mitochondrial DNA[.]" He agreed that trial counsel also questioned Agent Turbeville and Investigator Mardis about cross-contamination. Petitioner agreed that Investigator Mardis also found the two pair of underwear, which he collected in the same evidence bag, in "close proximity." He said, "The two pair of underwear c[a]me back to the victim and matching [him]."

Petitioner recalled telling trial counsel first that he was not in the location of the rape. Later, when the cell tower report came back, Petitioner told trial counsel that he was in the area "working a skip trace." He asserted that mistaken identity was his defense theory from "the git-go." Petitioner agreed that he told trial counsel that the police may have set him up. He explained that he had an affair with a police officer's wife and that Officer Mercado worked with that officer. He claimed that, "for several years after that, [officers] w[ere] relentless on harassing [him]." Petitioner asserted that "[h]alf the Chattanooga Police Department" harassed him by constantly pulling him over, showing up at his gym, and driving by his apartment.

Petitioner agreed that some of the DNA evidence was exculpatory and excluded him, including the DNA on a bag in his car, DNA found in the victim's car, and DNA from the bedroom comforter. He agreed that DNA from an unknown male was on all those items. Petitioner agreed that the victim's DNA was found on both pair of underwear from Petitioner's house.

Trial counsel testified that, prior to Petitioner's case, he tried "well over twenty" bench and jury trials. He said that he received discovery from Petitioner's attorney at the preliminary hearing and that he met with Petitioner about a dozen times. Trial counsel recalled that he filed and litigated a Motion to Suppress prior to trial. He recalled that the perpetrator took the victim's vehicle and that it was found by Petitioner's BMW, which was the basis for the search warrant.

Trial counsel recalled that he was concerned about the trial judge because she was female and because the case involved "a pretty vicious, violent rape of a young woman."

Trial counsel said that he presented Ms. Croft as an alibi witness for Petitioner and that he located her through the use of a private investigator. He said that Petitioner did not tell him that he was in contact with Ms. Croft or that there were jailhouse calls between the two.

Trial counsel said that he attempted plea negotiations prior to the suppression hearing and that Petitioner "didn't want a deal." When discussing potential defenses, Petitioner told trial counsel several theories:

> First, he didn't know anything about it. Then he was . . . looking for somebody skipping bond. Then it went to [Mr.] Ledford having something to do with it. There was that [Officer] Mercado had a personal dislike for him and just fingered him. Because supposedly [Petitioner] had an affair with [Officer] Mercado's girlfriend or something of that nature. And so it was a vendetta thing. From [Petitioner]'s employment over at the sheriff's office, there was some animosity.

> And then the Ledford thing actually had more legs to it [because he] had access, not only to [Petitioner]'s home, but more importantly the residence [where] [h]e was . . . doing some construction work. So [Mr. Ledford] had knowledge of the residence, he had knowledge of the layout. He had knowledge of the dog. He had knowledge of a safe. Mr. Ledford also had financial problems. I was able to verify some of those.

Trial counsel explained several financial difficulties Mr. Ledford had and that Mr. Ledford "suddenly [] got out of that" at the "same time frame" as the rape and burglary. Trial counsel said that he was able to cross-examine Mr. Ledford about his financial problems and his juvenile record. He said that Petitioner "filed a disciplinary complaint" against him prior to the motion for new trial, so he withdrew as counsel.

On cross-examination, trial counsel denied that he and the trial judge "didn't get along." Trial counsel did not remember saying in his opening statement that he would prove that someone else committed the crime. Trial counsel stated that he did not hire an expert on tool or pry markings. He agreed that, had an expert found that Petitioner's tools did not make the pry markings, that evidence would have been helpful at trial. Trial counsel added, "And also if [Petitioner's] alibi that turned out to be false was actually correct, that would have been helpful as well."

Trial counsel recalled that his Motion to Suppress was based on the curtilage search. He stated that he did not request a voice lineup and agreed that it would have been helpful

if the victim had been unable to identify Petitioner in the voice lineup. He agreed that, at trial, the victim did not recognize Petitioner's voice on the jailhouse phone calls.

Trial counsel could not recall the nature of the disciplinary complaint that Petitioner filed against him. He could not recall statements made by the trial court admonishing him. Trial counsel stated that he did not investigate cellular tower pings "[b]ecause [Petitioner] was not there, according to [Petitioner]. And in fact, according to him and Ms. Croft, Mr. Ledford not only ha[d] his vehicle, but also had his phone and also had all this other equipment." Trial counsel testified that he did not request any DNA testing.

Trial counsel recalled writing a letter to Petitioner after he withdrew as counsel, stating that he was "stunned at evidence from [Petitioner's] [jailhouse] phone call [with Ms. Croft] that at the time was rebuttal and not disclosed[.]" He agreed that he "probably" called Petitioner a "liar" in the letter "because he was a liar." Trial counsel said that he was not familiar with *State v. White* regarding jury instructions for kidnapping.

Trial counsel recalled that the State's theory was that the perpetrator wore a condom but said that he did not request lubricant testing of the bedding. Trial counsel said that there would "not necessarily" be lubricant on the bedding if a condom was used. Trial counsel recalled that the duct tape found in Petitioner's car was consistent with the duct tape used to bind the victim but said that he did not remember anything about the "fracture line" being inconsistent.

The post-conviction court granted Petitioner forty-five days to file a post-conviction hearing brief. In his post-hearing brief in support of post-conviction relief, Petitioner argued that he was denied the effective assistance of trial counsel due to trial counsel's (1) improper opening argument; (2) unauthorized abandonment of sentencing negotiations; (3) failure to investigate and request DNA and lubricant testing of the firearms, cell phone, penis, bedding, the victim's clothes, [and] gloves; (4) failure to retain expert witnesses regarding cross-contamination, tool pry markings, and cellular towers; (5) failure to object to evidence related to tool and pry markings; (6) failure to object to evidence related to the duct tape found in Petitioner's car; and (7) failure to request a voice lineup. Next, Petitioner argued that he was denied due process because (1) the trial court failed to charge the jury pursuant to *State v. White*; (2) trial counsel was biased against Petitioner; (3) the trial court was biased against Petitioner; (4) improper prosecutorial argument; and (5) evidence was seized in violation of the Fourth Amendment. Finally, Petitioner argued cumulative error. The post-conviction court denied Petitioner's post-conviction petition in a highly detailed written order, which we will address in our analysis. This court granted Petitioner permission to late-file a notice of appeal.

**Analysis**

On appeal, Petitioner reiterates verbatim his claims and arguments from his post-hearing brief, as asserted above. The State responds that Petitioner has not established that trial counsel was deficient or, alternatively, that any deficiency prejudiced Petitioner. It argues that Petitioner's stand-alone due process claims are previously determined or waived.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*I. Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of

counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

(1) Trial Counsel's Opening Statement

Petitioner claims that trial counsel made assertions in his opening statement that were unsupported by the evidence at trial. In *State v. Zimmerman*, this court said, in regards to opening statements by trial counsel, "The trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991) (quoting McCloskey, *Criminal Law Desk Book,* § 1506(3)(O) (Matthew Bender, 1990)).

The post-conviction court quoted trial counsel in its written order:

The evidence is going to show that somebody else did this crime. We're not denying that this girl was assaulted. It just wasn't [Petitioner]. And I feel confident in telling you that or at least guessing or foreseeing that the evidence is not going to go beyond the 50[-]yard line.

The post-conviction court listed several pieces of evidence presented at trial that supported trial counsel's assertion in his opening argument:

- that Mr. Ledford had access to the front door key; that Mr. Ledford had access to the code to open the garage door; and that Mr. Ledford knew how to gain entry to the house;

- that Mr. Ledford knew the layout of the house; that he knew where the bedrooms were located; and that he knew where the safe was located;

- that Mr. Ledford had a tool belt and carried various tools in his red truck, including a hammer, chisels, and a couple of pry bars;[]

- that Mr. Ledford's work was "feast or famine"; and that he was several thousand dollars behind in child support; and that he had his power turned off five times; and that his residence was starting to go into foreclosure[; and]

- [that] the victim . . . told police that she felt like the suspect knew the area and the house well because he never asked where the bedrooms were.

The post-conviction concluded, "consistent with the defense theory, [t]rial [c]ounsel elicited proof at trial to support the argument that someone else committed the crime, and he argued this proof to the jury."

We agree. Trial counsel supported his opening statement with evidence. As the post-conviction court stated, "It is clear from the jury's verdict that it credited the State's proof over the alternative theories advanced by [t]rial [c]ounsel." Thus, Petitioner has not shown deficient performance.

### (2) Abandonment of Sentencing Negotiations

Petitioner argues that trial counsel abandoned plea negotiations. The *Strickland* standard for determining whether a petitioner received the ineffective assistance of counsel applies in plea negotiations as well as during trial. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Missouri v. Frye*, 566 U.S. 134, 147 (2012).

The post-conviction court found that trial counsel presented Petitioner with a plea offer from the State for a fifteen- or twenty-year sentence. It noted that the State's offer required Petitioner to reveal the location of the jewelry taken from the home as "a condition

precedent to the offer being presented to the [c]ourt in the first instance." The post-conviction court stated:

> The contingent nature of this offer is important. At the post[-]conviction hearing, [Petitioner] testified that he would have accepted the offer and that he would have "attempted" to recover the jewelry. However, there is no proof before the [c]ourt that these attempted efforts would have been successful, even partially. . . . As such, this [c]ourt cannot conclude that clear and convincing evidence exists to show that the results of the sentencing hearing would have been different[.]

We agree. Petitioner was offered a plea deal, but he was unwilling or unable to meet the requirement of the plea offer. A petitioner must show by clear and convincing evidence that he would have been able to meet the condition precedent to a contingent plea offer in order to show that he suffered prejudice by going to trial. *See Arturo Jaimes-Garcia v. State*, No. M2015-02109-CCA-R3-PC, 2016 WL 6087668, at *12 (Tenn. Crim. App. Oct. 18, 2016) (concluding that the petitioner did not receive ineffective assistance where the petitioner's co-defendants' acceptance of a plea was a condition precedent to his contingent plea offer), *perm. app. denied* (Tenn. Feb 15, 2017); *see also Billy Cate v. State*, No. 03C01-9107-CR-00211, 1992 WL 42771, at *3 (Tenn. Crim. App. Mar. 9, 1992) (concluding that the petitioner did not receive ineffective assistance where the petitioner was "unable or unwilling" to name his suspected accomplices, which was a condition precedent to a contingent plea offer), *perm. app. denied* (Tenn. May 26, 1992).

### (3) Failure to Investigate and Request DNA & Lubricant Testing

Petitioner argues that trial counsel was ineffective for failure to pursue further DNA testing or lubricant testing of several items. The post-conviction court concluded that Petitioner did not produce the results of any DNA or lubricant testing and thus did not meet his burden to show that such results would have changed the outcome of the case. We agree. Petitioner did not present any evidence at the post-conviction hearing that further DNA or lubricant testing would have changed the outcome of the case, and we cannot grant relief based on speculation. *See John Moffitt v. State*, No. W2016-02487-CCA-R3-PC, 2017 WL 4124166, at *7 (Tenn. Crim. App. Sept. 18, 2017) (stating that, because the petitioner "did not offer any DNA testing[,] there is no proof that any of this evidence would have aided the [p]etitioner's defense"), *perm. app. denied* (Tenn. Jan. 22, 2018).

<u>(4) Failure to Retain Expert Witnesses on Cross-Contamination and Cellular Towers</u>

Petitioner argues that, while trial counsel understood that several pieces of evidence were inappropriately collected and stored together, trial counsel did not retain an expert witness to investigate and discredit the State's evidence on the basis of cross-contamination. He also asserts that trial counsel was deficient for failing to retain an expert in cellular towers to show that the "raw data" was not reliable to determine his location at the time of the rape. The post-conviction court noted that Petitioner did not present evidence of actual contamination about which an expert witness would testify. It also stated that Petitioner "also failed to present an expert on cell-tower location data in these proceedings." The post-conviction court concluded, "Without expert proof being presented at the post-conviction hearing, this [c]ourt cannot find that [Petitioner] has shown by clear and convincing evidence how [t]rial [c]ounsel's failure to call an expert here constituted ineffective assistance of counsel."

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "To establish prejudice, the petitioner must: (1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." *Denton v. State,* 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing *Black,* 794 S.W.2d at 757). Because Petitioner presented no expert witness at the evidentiary hearing, he is not entitled to relief on this ground.

<u>(5) Failure to Object to Evidence</u>

Petitioner argues that trial counsel was deficient for failing to object to, and move to exclude, evidence of tool and pry markings on the safe as none of the tools found in Petitioner's car matched the markings. The post-conviction court stated:

> It is true that the State's forensic expert from the TBI could not identify the marks on the safe as having come from [Petitioner]'s tools recovered from his BMW, and, indeed, [t]rial [c]ounsel brought this fact out in cross[-]examination. However, this fact went to the weight of the evidence and not to its fundamental admissibility. As such, [Petitioner] has not shown that this evidence was inadmissible as being irrelevant or that, had a relevancy objection been made, the objection would have been sustained by the trial court.

We agree. The evidence of tool pry markings and of the tools in Petitioner's trunk were relevant and admissible. *See* Tenn. R. Evid. 401, 403. Petitioner has not shown that an objection would have been sustained or that the evidence would have been excluded, and as such, he cannot show deficient performance. *See Goad*, 938 S.W.2d at 370. Moreover, even if the evidence had been excluded, the evidence of Petitioner's guilt -- with the victim's DNA in his underwear -- was overwhelming, and the result of the trial would not have been different. *See id*. Thus, Petitioner cannot show prejudice.

Petitioner also argues that trial counsel was deficient for failing to object to Officer Hamilton's expert testimony regarding cell phone towers on the basis that Officer Hamilton had only a single class in the subject.[2] Petitioner has failed to show that any objection to the trial court's finding that Officer Hamilton was a qualified expert would have succeeded. *See id*. Moreover, he has failed to show how a successful objection to this testimony would have resulted in a different outcome. *See id*. Petitioner is not entitled to relief.

### (6) Failure to Move to Exclude Duct Tape

Petitioner argues that, because Agent Littlejohn's report showed that the "fracture lines" did not match between the duct tape used to bind the victim and the duct tape found in Petitioner's car, trial counsel was deficient for failing to move to exclude evidence of the duct tape in Petitioner's car.

The post-conviction court found that Officer Mercado "may have testified" at the preliminary hearing that the two sets of duct tape were a match but said that trial counsel used that preliminary hearing testimony at trial to "impugn" Officer Mercado's trial testimony. Regarding the admissibility of the duct tape, the post-conviction court found that Agent Littlejohn testified that "both sets of duct tape 'were consist[e]nt with respect to size, appearance, and construction.'" It concluded, "Although Agent Littlejohn was unable to conclusively match the two samples as having come from the same roll, this evidence went to the weight of the evidence, not to its admissibility."

Petitioner offers no authority or rule of evidence that would have supported a motion to exclude the duct tape from his car simply because the "fracture lines" did not match. Moreover, trial counsel used Agent Littlejohn's report at trial to discredit a State's witness based on his prior sworn testimony. Thus, trial counsel was not deficient for failing to move to exclude the duct tape. *See id*.

---

[2] The post-conviction court made no findings on this issue.

- 26 -

## (7) Failure to Request a Voice Lineup

Petitioner argues that, because the victim could not identify Petitioner in a photographic lineup, and because the victim did not recognize Petitioner's voice in recorded jailhouse phone calls that were played at trial, trial counsel was deficient for failing to request a voice lineup. The post-conviction court found that the victim was never asked to make a voice identification at trial. It stated:

> In this case, [Petitioner] failed to present the victim to testify at the post-conviction hearing. Even absent calling the victim, [Petitioner] failed to show of what a voice lineup would have consisted or what the result of the experiment would be. In essence, [Petitioner] asks the [c]ourt to speculate that the victim would not have identified [Petitioner]'s voice as the one she heard the night of the crimes. And, while the [c]ourt could believe that this outcome is one possibility among a range of possibilities, any such belief is hardly proof by clear and convincing evidence. To the contrary, it is speculation in fact.

We agree. Because Petitioner failed to present either the victim or the result of a voice lineup at the post-conviction hearing, he cannot show deficient performance. *Ricky Franklin York v. State*, No. M2002-00817-CCA-R3-PC, 2003 WL 213782, at *3 (Tenn. Crim. App. Jan. 31, 2003) (citing *Black,* 794 S.W.2d at 757) ("It is the [petitioner's] duty to present evidence or witnesses at the evidentiary hearing to support his claim.").

## (8) Trial Counsel's Alleged Bias Against Petitioner

Petitioner alleges that trial counsel was biased against Petitioner, and he submits a post-trial letter from trial counsel in support of his assertions. The post-conviction court found that the evidence at the post-conviction hearing

> did not show that [Petitioner] and [t]rial [c]ounsel had an irreparable relationship or that [t]rial [c]ounsel was motivated by any personal animus toward [Petitioner] during the trial of the case. Rather, the animus cited by [Petitioner] came in response to events that arose after the trial in which [Petitioner] made a complaint about [t]rial [c]ounsel's representation to the Board of Professional Responsibility.

The post-conviction court found that trial counsel "constructed a reasonable defense theory of the case; he conducted rigorous cross-examination of [S]tate witnesses; he

- 27 -

presented the defense's case-in-chief through available witnesses; and he made impassioned and logical closing arguments on the proof introduced at trial."

Reviewing the letter from trial counsel to Petitioner, the post-conviction court noted "direct and personal reflections" on Petitioner's case, which were quite negative. However, the post-conviction court concluded that, "[e]ven presuming that [t]rial [c]ounsel harbored some or all of these feelings through the trial of the case, [Petitioner] has not shown by clear and convincing evidence that he was effectively or constructively deprived of the effective assistance of counsel" because "the proof presented at the post-conviction hearing in this case did not demonstrate anything close to . . . the virtual or complete abandonment of the duty of loyalty."

The evidence does not preponderate against the findings of the post-conviction court. Trial counsel testified that he sent the letter to Petitioner after trial and after Petitioner filed a disciplinary action against him with the Board of Professional Responsibility. Petitioner presented no evidence that any animus existed between himself and trial counsel during the course of the trial. Moreover, Petitioner retained trial counsel and never sought to replace him. As such, Petitioner has not established that he was denied the effective assistance of counsel.

*II. Due Process*

(1) Absence of a *State v. White* Jury Instruction on Kidnapping

Petitioner argues that, because the victim's confinement was only incidental to the robbery and rape, he was prejudiced by the trial court's failure to issue a jury instruction pursuant to *State v. White*.

In *White,* the Tennessee Supreme Court addressed how due process considerations affect convictions for kidnapping and an accompanying felony. In that case, the supreme court held:

> [T]he legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

*White,* 362 S.W.3d at 562.

- 28 -

Here, the post-conviction court noted that the holding in *White* was entered after Petitioner's conviction in 2012. The post-conviction court also found that this issue was previously determined on direct appeal when this court determined that Petitioner's rights were violated but that the error was harmless beyond a reasonable doubt. *Tracy A. Roberson,* 2013 WL 5775832, at \*23-26. Thus, the post-conviction court declined to review the *White* jury instruction claim.

We agree. An issue or ground for relief is previously determined if "a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." Tenn. Code Ann. § 40-30-106(h) (2019). Because we have previously determined this issue, we cannot relitigate it. *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). Petitioner is not entitled to relief.

### (2) Trial Judge's Alleged Bias

Petitioner argues that the trial judge was biased against him since she was a female and, as trial counsel testified, the charges against Petitioner were a "pretty vicious, violent rape of a young woman." He asserts that the trial court pre-judged his motion to suppress without hearing the evidence and that it "repeatedly mocked and criticized" trial counsel.

After reviewing the trial transcript and the direct appeal, the post-conviction court concluded:

> [T]his [c]ourt cannot find that one would reasonably or objectively believe that the trial judge harbored any bias in the case. Nevertheless, and aside from the merits, this issue is substantially identical to an issue raised by [Petitioner] on his direct appeal, and, as such, the issue is likely one that has been previously determined.

It declined to review the claims, stating that, even if the claims on post-conviction were "slightly different" from the one presented on direct appeal, Petitioner "had an opportunity to raise all issues related to judicial bias previously," and thus, any claim of judicial bias was waived.

We conclude that this issue was previously determined on direct appeal. *Tracy A. Roberson,* 2013 WL 5775832, at \*28 ("The Defendant claims that the trial court showed bias in favor of the State throughout the proceedings to such a degree that it deprived him of a fair trial."); Tenn. Code Ann. § 40-30-106(h) (2019). As such, we will not consider

- 29 -

any off-hand comments made by the trial court or the trial court's gender as stand-alone claims available for review. *Holland*, 610 S.W.3d at 458.

### (4) Improper Prosecutorial Argument

Petitioner argues that the prosecutor made inappropriate statements during his closing argument because he called Petitioner a person of "small stature." The post-conviction court found that the prosecutor did refer to Petitioner as a person of "small stature." It stated that, even if the term was "derogatory," this issue was waived.

A ground for post-conviction relief is waived if:

the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) [t]he claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) [t]he failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g) (2019). Because Petitioner's claim is not based upon a newly determined constitutional right requiring retroactive application, and because his failure to present this ground on direct appeal was not the result of State action, it is waived.

### (5) Fourth Amendment

Petitioner argues that his constitutional rights were violated when the trial court denied his motion to suppress evidence pursuant to an illegal search and seizure. The post-conviction court found that a post-conviction petition was not the proper vehicle for this claim and that the claim was previously determined, both in the trial court and on direct appeal.

Petitioner raised this issue in a suppression motion, and this court reviewed on direct appeal the trial court's determination. *Tracy A. Roberson,* 2013 WL 5775832, at *1, *13-16. On direct appeal, we reviewed the language of the search warrant and determined that

[t]he affidavit include[d] specific language about the crimes committed, evidence linking [Petitioner] to the crimes, and a basis for belief that items relating to the crimes would be found in [Petitioner]'s home, car, or on his person. This information supported issuance of the search warrant and, therefore, the evidence seized in this case was found pursuant to the lawful execution of the search warrant.

*Id*. at *15. Moreover, we explained that "observations while approaching the residence do not constitute information obtained as a result of a warrantless entry into the residence and could properly be considered in issuing the search warrant." *Id*. Finally, we concluded that the period of time Petitioner was detained during the search was "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id*. We are prohibited from relitigating this previously determined issue. Tenn. Code Ann. § 40-30-106(h) (2019); *Holland*, 610 S.W.3d at 458.

### III. Cumulative Error

Petitioner argues that cumulative error warrants reversal. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77.

Here, we have found no errors. Thus, cumulative error review is unwarranted.

### **Conclusion**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 31 -